Filed 5/24/21  P. v. Walker CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E073112 |
| v. | (Super.Ct.No. FVI18002016) |
| ROY LEE WALKER, JR., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Cara D. Hutson, Judge.  Affirmed.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Alana Cohen Butler, Deputy Attorneys General, for Plaintiff and Respondent.

## I.  INTRODUCTION

Defendant and appellant Roy Lee Walker, Jr., was convicted by a jury of multiple sex offenses involving three female victims, K.S., K.F., and D.R.  With respect to K.S., defendant was convicted of one count of sexual intercourse with a child 10 years old or younger (Pen. Code,[1] § 288.7, subd. (a); count 1); one count of aggravated sexual assault of a child involving rape by force or duress (§§ 261, subd. (a)(2), 269, subd. (a)(1); count 2); and one count of committing a lewd act upon a child under the age of 14 (§ 288, subd. (a); count 3).  With respect to K.F., defendant was convicted of one count of aggravated sexual assault of a child involving oral copulation by force or duress (§§ 269, subd. (a)(1), 288, subd. (c)(2); count 4) and one count of committing a lewd act upon a child (§ 288, subd. (a); count 6).  Finally, with respect to D.R., defendant was convicted of one count of committing a lewd act upon a child between the ages of 14 and 15 years old.  (§ 288, subd. (c)(1); count 8.)  Additionally, the jury found true special allegations that defendant personally inflicted bodily harm on a victim under the age of 14 in the commission of count 3 (§ 667.61, subds. (a), (d)(7)), and that defendant had committed a qualifying offense against multiple victims with respect to the commission of counts 3 and 6 (§ 667.61, subds. (b), (e)(4)).

Defendant was sentenced to a determinate term of three years on count 8 (§ 288, subd. (c)(1)) and an indeterminate term of 95 years to life on the remaining counts—representing 25 years to life on count 1 (§ 288.7, subd. (a)); a consecutive term of

---

[1] Undesignated statutory references are to the Penal Code.

2

25 years to life on count 3 (§ 288, subd. (a)), as a result of the jury's true finding that defendant inflicted bodily harm on a child under the age of 14 in the commission of the offense (§ 667.61, subds. (a)-(d)); and consecutive terms of 15 years to life on count 2 (§ 269, subd. (a)(1)), count 4 (§ 269, subd. (a)(4)), and count 6 (§ 288, subd. (a)).

On appeal, defendant argues his conviction must be reversed because the trial court erred when it admitted evidence pertaining to child sexual abuse accommodation syndrome (CSAAS), instructed the jury pursuant to CALCRIM No. 1193 regarding the limited use of CSAAS evidence and admitted testimony of uncharged sexual misconduct as propensity evidence pursuant to Evidence Code section 1108. Additionally, defendant contends the trial court erred in sentencing him to consecutive terms of imprisonment on count 3 and count 6 because the jury's verdict is unclear whether his conviction for those offenses arises from the same conduct as his conviction for other offenses. We find no error in the record with respect to these issues, and we affirm the judgment.

## II. FACTS AND PROCEDURAL HISTORY

A. *Facts and Charges*

In July 2018, K.S. came forward and reported that she had been sexually abused over an extended period of time by defendant. During the course of their investigation, law enforcement discovered two additional girls, K.F. and D.R., who also accused defendant of inappropriate sexual contact.

As a result of these allegations, defendant was charged in a first amended information with one count of sexual intercourse with a child 10 years old or younger (§ 288.7, subd. (a); count 1); one count of aggravated sexual assault of a child involving

3

rape by force or duress (§§ 261, subd. (a)(2), (6), 269, subd. (a)(1); count 2); and one count of committing a lewd act upon a child under 14 years of age (§ 288, subd. (a); count 3) involving K.S.  He was charged with one count of aggravated sexual assault of a child involving oral copulation by force or duress (§§ 269, subd. (a)(4), former 288a, subds. (c)(2), (3) & (d) (Stats 2018, ch. 423, § 49); count 4); one count of aggravated sexual assault (§ 289, subd. (a); count 5); one count of committing a lewd act upon a child (§ 288, subd. (a); count 6); and one count of committing a lewd act upon a child who was 14 years old (§ 288, subd. (c)(1); count 7) involving K.F.  Finally, defendant was charged with one count of committing a lewd act upon a child who was between the ages of 14 and 15 years old (§ 288, subd. (c)(1); count 8) involving D.R.

Additionally, the information alleged that defendant personally inflicted bodily harm on a victim under the age of 14 in the commission of count 3 (§ 667.61, subds. (a), (d)(7)), and that defendant had committed a qualifying offense against multiple victims with respect to the commission of counts 3 and 6 (§ 667.61, subds. (b), (e)(4)).

B.  *Relevant Evidence at Trial*

1.  <u>Testimony of K.W.</u>

K.W. and defendant are married and have two sons together.  K.W. also has two daughters from previous relationships:  K.F., who was born in August 2003, and K.S., who was born in April 2005.  Following her marriage to defendant in 2007, K.W. and her two daughters began living together with defendant in the same home.

4

Defendant became primarily responsible for childcare during the weekdays, since K.W. worked full time during the week and defendant only worked on weekends. The family moved into a house in Apple Valley in 2009 and moved to another home in Adelanto in 2012. Starting in 2016, another girl, D.R., also lived with the family for extended periods of time. K.W. was unaware of any allegations that defendant had engaged in sexual conduct with her children until 2018.

On cross-examination, K.W. confirmed that she worked as a social worker; was trained to look for physical, emotional, and behavioral signs of child abuse; and was a mandated reporter of suspected child abuse. Despite her training, K.W. admitted that she did not observe any significant changes in her children's behavior and never suspected any abuse involving her children.

2. Testimony of K.S.

K.S. was 13 years of age at the time of trial. She believed that defendant had been performing acts of a sexual nature on her since she was three or five years old. In her earliest memory of such an incident, she was on defendant's bed in the master bedroom of their home in Apple Valley. She could not recall exactly what happened, but she recalled trying to crawl away from defendant, being pulled back, and being told, "Be quiet, or I'll do your butt again."

K.S. recalled that after they moved from Apple Valley to a home in Adelanto, defendant would frequently abuse her by calling her into a room, closing the door, instructing her to remove her pants and underwear, and having intercourse with her. This occurred in multiple rooms in their home at least once a month and sometimes as often as

5

once a week. This type of interaction with defendant occurred repeatedly when she was between the ages of five and 10, and continued until she was 13 years old. K.S. also recalled an incident in which defendant forced her to orally copulate him in the garage of their home, as well as at least two incidents in which defendant forced her to engage in intercourse in vehicles.

K.S. never disclosed the abuse because she was afraid, unsure if her mother would believe her, could not think of anyone else in whom she could confide, and believed defendant might become violent if she said anything. Eventually, she disclosed the abuse to a cousin in July 2018.

On cross-examination, K.S. admitted that her early memories of alleged abuse were scarce and incomplete. She also admitted reporting inconsistent versions of events to a sheriff's deputy when initially interviewed. K.S. admitted that her relationship with defendant "has always been fairly rocky"; she "never really got along with him"; and some of her issues with defendant stemmed from her belief that he favored her brothers.

3. Testimony of K.F.

K.F. was 15 years old at the time of trial. The earliest incident she could recall that involved defendant touching her in a way that made her feel uncomfortable occurred in their home in Apple Valley. K.F. remembered that she was watching a movie in the living room of their home when defendant walked up behind her, reached under her clothing, and began rubbing her vagina. K.F. believed that defendant also touched her in a similar manner "more than . . . two or three" times while they were living in Adelanto. She specifically recalled incidents that occurred in a bedroom on the second floor, a

6

bedroom on the first floor, a playroom, and the garage of that home. She estimated that these incidents happened at least once a year and "maybe" every six months.

K.F. further recalled that on one occasion in the playroom of their home, defendant exposed his penis to her, placed it inside her mouth, and told her, "Don't bite down." When she pulled away from him, defendant again inserted his penis into her mouth a second time. She did not recall exactly how old she was at the time of this incident, but she estimated that it occurred when she was 11 or 12 years old.

K.F. recalled occasions in which defendant would try to touch her breasts and vagina when they would "rough house"; grabbed her hand and rubbed it on his exposed penis; and came into her bedroom at night, woke her up, and orally copulated her.

K.F. never disclosed any of these incidents until July 2018. When asked why she never disclosed these incidents prior to 2018, K.F. stated she was scared, and defendant had told her not to tell anyone. On cross-examination, K.F. admitted she made inconsistent statements regarding her relationship with defendant when initially pressed by a sheriff's deputy regarding whether defendant had done anything to her. K.F. also admitted that she did not have a good relationship with defendant and believed defendant favored his two biological children over her and K.S.

4. Testimony of D.R.

D.R. was 16 years old at the time of trial. She lived with defendant's family for several months at a time in 2016 and 2017. She testified that on one occasion in 2017, defendant asked her if he could give her a massage. She was fully clothed during this

incident, and defendant came close to touching her buttocks; but he did not actually do so.

Some months later, defendant again asked to give D.R. a massage. When D.R. responded, "No," defendant told her to lie on the floor, and she complied by lying on her stomach. During this second incident, defendant rubbed her buttocks, unclipped her bra, reached under her to rub her breasts, and rubbed her inner thighs close to her privates. Defendant continued with the massage, even after D.R. told him to stop.

On a third occasion, defendant used a hand tool to massage D.R. while she was fully clothed. However, he eventually told D.R. to lie on her back, unbuckled her pants, and began to rub her vagina. When D.R. tried to flip over onto her stomach and get up, defendant held her legs down to prevent her from doing so. Defendant eventually stopped when they were interrupted by K.S. After the incident, defendant gave D.R. $40 and told her not to tell anyone about the incident.

On cross-examination, D.R. admitted that her prior statements to law enforcement did not include some of the events described in her trial testimony and were not consistent with her trial testimony; she also admitted that she initially denied being abused when she was questioned by a sheriff's deputy.

5. Testimony of K.O.

Over defendant's objection, the trial court admitted the testimony of K.O. as propensity evidence pursuant to Evidence Code section 1108. K.O. testified that she used to work with defendant when she was approximately 15 years old. During this time, defendant would ask her sexually suggestive questions, such as what she would be

8

willing to do if someone offered to pay her to have sex; what she would do if he, specifically, asked to pay her to have sex; and whether she wanted to see a tattoo in the area of his penis. K.O. admitted that defendant never physically touched her.

6. Testimony of CSAAS Expert

The prosecution called a clinical and forensic psychologist to testify as an expert on CSAAS. The expert explained that CSAAS is a pattern of behaviors that many children who have been sexually abused exhibit and includes secrecy, helplessness, entrapment and accommodation, delayed unconvincing disclosure, and retraction or recantation. On cross-examination, the expert confirmed that CSAAS is not a diagnostic tool, and that the pattern of behaviors cannot be used as a diagnostic tool to determine whether or not a child has in fact been abused. The expert was not asked any questions specific to the facts of the case or to the parties.

C. *Verdict and Sentence*

Following the presentation of evidence, the trial court granted a motion by the prosecution to dismiss the charges related to count 5 (§ 269, subd. (a)(5)) and count 7 (§ 288, subd. (c)(1)). The jury found defendant guilty of the remaining charges and found true each of the special allegations alleged.

The trial court sentenced defendant to a term of 25 years to life on count 1 (§ 288.7, subd. (a)); a consecutive term of 25 years to life on count 3 (§ 288, subd. (a)), as a result of the jury's true finding that defendant inflicted bodily harm on a child under the age of 14 years old in the commission of the offense (§ 667.61, subds. (a)-(d)); consecutive terms of 15 years to life on count 2 (§ 269, subd. (a)(1)), count 4 (§ 269,

9

subd. (a)(4)), and count 6 (§ 288, subd. (a)); and a determinate term of three years on count 8 (§ 288, subd. (c)(1)).

## III.  DISCUSSION

A.  *The Trial Court Did Not Err in Admitting Expert Testimony on CSAAS*

Defendant claims the trial court erred when it admitted testimony from the prosecution's expert on CSAAS.  Specifically, defendant contends that CSAAS testimony should have been excluded because (1) such matters are common knowledge and no longer a proper subject of expert testimony; (2) the testimony lacked foundation for failure to show its scientific reliability; (3) the testimony was more prejudicial than probative; and (4) admission of the testimony violated his constitutional rights under the Fifth, Sixth, and Fourteenth Amendments.  We find no merit in any of these arguments.

### 1.  CSAAS Remains a Proper Subject of Expert Testimony

Defendant argues that CSAAS is no longer a proper subject of expert testimony because the misconceptions that CSAAS evidence is intended to refute are no longer present, and lay jurors are capable of resolving any credibility issues on their own.  In essence, defendant's argument is that such testimony is not the proper subject of expert testimony because it does not assist the jury in evaluating the evidence presented.  We disagree.

"Evidence Code section 801 qualifies a matter as the proper subject for expert testimony if it is 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.'  That is not to say, however, that the jury need be wholly ignorant of the subject matter of the expert opinion in order for it to be admissible.

10

[Citation.]  Rather, expert opinion testimony ' "will be excluded only when it would add *nothing at all* to the jury's common fund of information, i.e., when 'the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness.' " ' " (*People v. Jones* (2012) 54 Cal.4th 1, 60.)

"Expert testimony on 'the common reactions of child molestation victims,' known as CSAAS theory evidence, 'is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation.' " (*People v. Julian* (2019) 34 Cal.App.5th 878, 885 (*Julian*); *People v. Munch* (2020) 52 Cal.App.5th 464, 468 (*Munch*).)  In the words of the California Supreme Court:  " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.  [¶]  The great majority of courts approve such expert rebuttal testimony.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1301 (*McAlpin*).)

CSAAS evidence "has been ruled to be properly admitted by the courts of this state for decades" (*Munch*, *supra*, 52 Cal.App.5th at p. 472), and the California Supreme Court has on more than one occasion referenced CSAAS evidence as an example of expert testimony that may be helpful to a jury.  (See *McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1301; *People v. Brown* (2004) 33 Cal.4th 892, 906-907.)  Notably, even after completion of defendant's trial in this case, published opinions by the Court of Appeal have continued to recognize that CSAAS remains a proper subject of expert testimony for

the purpose of disabusing jurors of commonly held misconceptions about child sexual abuse. (*Julian*, *supra*, 34 Cal.App.5th at p. 885; *Munch*, at p. 468.) Given these authorities, we are not persuaded by defendant's argument that CSAAS is no longer a proper subject of expert testimony because it is not helpful to a jury.

2. Expert Opinions on CSAAS Are Not "Scientific Evidence" Subject to *Kelly/Frye*[2]

Defendant also argues that the admission of expert testimony on CSAAS in this case was erroneous because it lacked foundation absent a showing of reliability and general acceptance under the *Kelly/Frye* rule of admissibility. Again, we disagree.

Under the *Kelly/Frye* rule of admissibility, evidence derived from a new scientific technique is inadmissible unless the proponent first shows that the technique is generally accepted in the relevant scientific community, the witness testifying to the technique is properly qualified as an expert, and the person who performed the technique uses correct scientific procedures. (*People v. Jackson* (2016) 1 Cal.5th 269, 315-316.) However, "California distinguishes between expert medical opinion and scientific evidence; the former is not subject to the special admissibility rule of *Kelly-Frye*." (*People v. Ward* (1999) 71 Cal.App.4th 368, 373.) With respect to expert testimony, " '*Kelly/Frye* only applies to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law.' " (*Jackson*, at p. 316.)

---

[2] *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*); *Frye v. United States* (1923) 293 F.1013 (*Frye*).

12

While defendant claims the California Supreme Court has never expressly addressed whether expert opinions on CSAAS constitute scientific evidence subject to *Kelly/Frye*, this court has addressed that very issue. In *People v. Harlan* (1990) 222 Cal.App.3d 439, this court expressly held that *Kelly/Frye* does not apply to a psychologist's opinions regarding the common reactions of child sexual abuse victims. (*Harlan*, at pp. 448-449.) As we explained in that case, expert opinions that are based upon the expert's professional education, training and experience " 'meet traditional standards for competent expert opinion, without need for additional screening procedures applicable to new, novel, or experimental 'scientific' evidence not previously accepted in court.' " (*Id.* at p. 449.) More recently, our colleagues in the Second District Court of Appeal reemphasized that CSAAS evidence is " 'based on [the expert's] clinical experience with child sexual abuse victims and on [his or] her familiarity with professional literature in the area' [and] '[t]he *Kelly/Frye* rule does not apply to this type of evidence.' " (*Munch*, *supra*, 52 Cal.App.5th at p. 473.) Thus, we disagree that the CSAAS testimony in this case lacked foundation for any alleged failure to show its reliability under *Kelly/Frye*, and we find no error on this ground.

3. The Trial Court Did Not Abuse its Discretion in Admitting CSAAS Testimony

Finally, defendant contends admission of CSAAS evidence was erroneous because its probative value was substantially outweighed by the risk the jury would misuse the evidence to infer guilt. Additionally, defendant contends his constitutional rights to due process and a fair trial were violated because the CSAAS evidence in this case was, in fact, misused as evidence of guilt. We do not believe the record supports these claims.

Generally, "Evidence Code section 352 accords the trial court broad discretion to exclude even relevant evidence 'if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' 'Evidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." ' " (*People v. Clark* (2011) 52 Cal.4th 856, 893.) We apply the abuse of discretion standard to review the trial court's decision to admit the testimony of an expert (*People v. Prince* (2007) 40 Cal.4th 1179, 1222), as well as to claims that evidence should have been excluded under Evidence Code section 352. (*Clark*, at p. 893.)

Here, K.S., K.F., and D.R. were all questioned on cross-examination regarding their delayed reporting, prior denials of abuse, as well as the seemingly inconsistent statements they made when initially reporting the abuse to law enforcement. Further, defense counsel elicited testimony from K.S. and K.F.'s mother regarding her training in recognizing signs of abuse and her failure to observe any behavioral changes in her daughters that would lead her to believe they were being abused. Where defense counsel elicits testimony regarding the seemingly self-impeaching behavior of a victim in order to challenge the victim's credibility, CSAAS testimony is admissible for the purpose of rehabilitating that witness. Thus, CSAAS evidence was unquestionably relevant to issues presented in this case.

Nor was the testimony of the CSAAS expert particularly prejudicial. The testimony was brief and generalized, consisting almost entirely of describing the five

14

general behaviors commonly exhibited by child sexual abuse victims. The expert was not asked about any facts specific to the case and gave no opinions specific to the case. Additionally, the expert made clear that CSAAS cannot be used as a diagnostic tool to determine, after the fact, whether a child has actually been abused. Finally, to the extent the limited use of this testimony remained unclear, the trial court provided specific, limiting instructions that the CSAAS testimony could not be relied upon to prove that abuse had actually occurred.

Thus, defendant's characterizations on appeal that the expert's testimony (1) was likely to be misused by the jury as a diagnostic tool to determine the victims were molested; (2) was "inflammatory"; (3) encouraged jurors to find the fact of abuse based upon the victim's behaviors; or (4) was used to improperly corroborate any specific victim's testimony, are simply not supported by the record. Because the CSAAS evidence in this case was relevant and not unduly prejudicial, we find no abuse of discretion in the trial court's decision to admit the testimony.

Additionally, because we conclude the trial court did not abuse its discretion in admitting CSAAS evidence, we also conclude that defendant has failed to show that admission of such evidence constituted a violation of his constitutional rights to a fair trial or due process. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 670 ["Because the trial court did not abuse its discretion under state law in admitting . . . evidence over defendant's objections, [defendant's] claim that the admission of this evidence violated his constitutional right to a fair trial, to the extent it is preserved for appeal, also is without merit."]; *People v. Jablonski* (2006) 37 Cal.4th 774, 835 [where trial court did

not abuse its discretion under Evid. Code, § 352, Supreme Court necessarily also rejects "the edifice of constitutional violation" the defendant attempts to construct based on such claim of error].)

B. *The Trial Court Did Not Err in Using CALCRIM No. 1193 To Instruct the Jury*

In addition to his claims that the trial court erred in admitting CSAAS evidence, defendant contends the trial court erred in using the standard jury instruction on the limited use of CSAAS. Specifically, the trial court instructed the jury using CALCRIM No. 1193, which provides that an expert's "testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged," and that the jury "may consider this evidence only in deciding whether or not [the victim's] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of [the victims'] testimony." Defendant contends this instruction is inadequate because it does not affirmatively state that CSAAS evidence may not be used to determine whether abuse has occurred, and that the instruction effectively reduces the prosecution's burden of proof. We disagree.

" 'We determine whether a jury instruction correctly states the law under the independent or de novo standard of review.' " (*People v. Poroj* (2010) 190 Cal.App.4th 165, 172.)

With respect to CALCRIM No. 1193, our colleagues in the Second District Court of Appeal recently considered the adequacy of this very instruction in *People v. Gonzales* (2017) 16 Cal.App.5th 494 (*Gonzales*). In that case, the defendant asserted a nearly identical argument that "it is impossible to use the CSAAS testimony to evaluate the

16

believability of [the victim's] testimony without using it as proof that [defendant] committed the charged crimes." (*Id.* at p. 503.) In rejecting this argument, the Court of Appeal explained, "The instruction must be understood in the context of [the CSAAS expert's] testimony. [The expert] testified that CSAAS is not a tool to help diagnose whether a child has actually been abused. She said that if it is not known whether a child has been abused, CSAAS is not helpful in determining whether a child has, in fact, been abused. . . . [¶] A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert's] testimony to conclude that [the victim's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use [the expert's] testimony to conclude [the victim] was, in fact, molested. The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior. Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the victim's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction." (*Id.* at pp. 503-504.)

During the pendency of this appeal, the Second District Court of Appeal issued another decision again upholding the validity of CALCRIM No. 1193. (*Munch*, *supra*, 52 Cal.App.5th at p. 474.) This time, the Court of Appeal addressed the argument that the instruction effectively lowers the prosecution's burden of proof. (*Ibid.*) In rejecting this argument, the Court of Appeal noted that CALCRIM No. 1193 must also be viewed in the context of other instructions given by the trial court, and there was no error where the combination of instructions "would not provide any reasonable juror grounds to

17

believe CSAAS evidence could be used" to reduce the prosecution's burden of proof. (*Munch*, at p. 474.)

Defendant acknowledges the recent decision in *Gonzales*, *supra*, 16 Cal.App.5th 494, but he contends the case was wrongly decided and urges us to reach a different conclusion.  However, after consideration of these authorities, we agree with the reasoning set forth in *Gonzales* and in *Munch*, *supra*, 52 Cal.App.5th 464.  The adequacy and alleged prejudicial impact of a jury instruction cannot be viewed in a vacuum. Instead, any given instruction must be considered in the context of the evidence presented in the case as well as other jury instructions bearing on the same issues.

Here, the prosecution's CSAAS expert clearly testified that CSAAS cannot be used as a diagnostic tool to determine if abuse actually occurred.  Thus, in the context of the actual evidence adduced at trial, we see no basis to conclude that the jury might have been misled by CALCRIM No. 1193 to rely upon the CSAAS expert's testimony for the very purpose that the expert admitted it could not be used.  Further, as the People point out, the jury was instructed on the presumption of innocence and the prosecution's burden of proof, to consider evidence only for a specified limited purpose if instructed to do so, and to consider all instructions together.  Accordingly, when viewed in the context of other relevant jury instructions, we disagree that CALCRIM No. 1193 could be misinterpreted by the jury to lower the prosecution's burden of proof.  We are not persuaded by defendant's claims to the contrary and find no error in the trial court's use of CALCRIM No. 1193 to instruct the jury in this case.

C. *The Trial Court Did Not Abuse Its Discretion in Admitting Propensity Evidence Under Evidence Code Section 1108*

Defendant also contends that the admission of K.O.'s testimony regarding uncharged sexual misconduct was erroneous. He does not contest that such evidence met the general admissibility requirements for propensity evidence under Evidence Code section 1108; but he argues that the trial court should have excluded the testimony as more prejudicial than probative under Evidence Code section 352 or, alternatively, that Evidence Code section 1108 is unconstitutional. We find no error in the admission of K.O.'s testimony.

1. The Trial Court Did Not Abuse Its Discretion in Admitting K.O.'s Testimony

"When a defendant is accused of a sex offense, Evidence Code section 1108 permits the court to admit evidence of the defendant's commission of other sex offenses, thus allowing the jury to learn of the defendant's possible disposition to commit sex crimes. [Citation.] The court has discretion under Evidence Code section 352 to exclude the evidence if it is unduly prejudicial." (*People v. Cordova* (2015) 62 Cal.4th 104, 132 (*Cordova*).)

Five factors that "stand out as particularly significant in an Evidence Code section 1108 case" are: "(1) whether the propensity evidence has probative value, e.g., whether the uncharged conduct is similar enough to the charged behavior to tend to show the defendant did in fact commit the charged offense; (2) whether the propensity evidence is stronger and more inflammatory than evidence of the defendant's charged acts, (3) whether the uncharged conduct is remote or stale; (4) whether the propensity evidence

19

is likely to confuse or distract the jurors from their main inquiry, e.g., whether the jury might be tempted to punish the defendant for his uncharged, unpunished conduct; and (5) whether admission of the propensity evidence will require an undue consumption of time." (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117.)[3]  However, "[t]he evidence is presumed admissible and is to be excluded only if its prejudicial effect substantially outweighs its probative value in showing the defendant's disposition to commit the charged sex offense or other relevant matters.  [Citations.]  The court's ruling admitting the evidence is reviewed for abuse of discretion." (*Cordova*, *supra*, 62 Cal.4th at p. 132.)

Here, defendant concedes that, of the five particularly significant factors, at least three did not weigh in favor of exclusion, since the testimony of K.O. involved acts that were not remote in time, were less inflammatory than the charged conduct, and consumed a small amount of time at trial.  Nevertheless, defendant argues that the propensity evidence was not probative, and it risked confusing the jury because it was too dissimilar

---

[3]  We note the weighing process depends upon " 'the unique facts and issues of each case,' " and other factors may be relevant. (*People v. Nguyen*, *supra*, 184 Cal.App.4th at p. 1116.)  The California Supreme Court has delineated a more complete list of factors such as the uncharged conduct's " 'nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense.' " (*People v. Loy* (2011) 52 Cal.4th 46, 61 (*Loy*).)  However, not all of these factors will necessarily be relevant in each case, and defendant has only discussed the five particularly significant factors in his briefing on appeal.

to the charged conduct involving sexual intercourse and oral copulation of defendant's step-daughters.

However, defendant's argument overlooks the fact that in addition to being charged with engaging in sexual intercourse and oral copulation of K.S. and K.F., defendant was also charged with lewd conduct involving D.R., who alleged that defendant inappropriately touched her on multiple occasions during massages when she was a teenager and testified that following one occasion, defendant paid her $40. Clearly, these allegations bore some similarity to K.O.'s testimony that defendant made sexually suggestive comments toward her, including the suggestion that he might be willing to pay her for sex. Defendant's statements to K.O., a 15-year-old child, suggesting that he would pay her for sex are one form of sexual misconduct directed towards a minor, which demonstrate defendant's propensity for sexual misconduct with minors. Defendant's statements manifest a desire for the type of physical sexual misconduct that occurred in this case.

The fact that K.O's testimony did not precisely mirror the allegations made by D.R. is not dispositive. As our Supreme Court has stated: "Although [dissimilarity] is also a relevant factor for the court to consider in exercising its discretion [citation], dissimilarity alone does not compel exclusion of the evidence. ' "[T]he charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under Evidence Code section 1101, otherwise Evidence Code section 1108 would serve no purpose. It is enough the charged and uncharged offenses are sex offenses as defined in section 1108." ' " (*Cordova*, *supra*, 62 Cal.4th at p. 133.) Thus,

21

we cannot say that K.O.'s testimony was so dissimilar to all of the charged conduct such that it lacked any probative value as propensity evidence or would confuse the jury as to what issues it was being called upon to decide. Since the evidence had some probative value and nearly all of the factors indicating potential prejudice were not present in this case, we find no abuse of discretion on this record.

    2. <u>We Are Bound by the California Supreme Court's Determination as to the Constitutionality of Evidence Code Section 1108</u>

    In the alternative, defendant argues that Evidence Code section 1108 is per se unconstitutional. Defendant acknowledges that the California Supreme Court explicitly found Evidence Code section 1108 constitutional in *People v. Falsetta* (1999) 21 Cal.4th 903, but he argues we should reconsider the constitutionality of the provision in light of the views expressed in various federal authorities and treatises. However, persuasive as these may be, the California Supreme Court has been asked to revisit its decision in *Falsetta* on multiple occasions and has expressly declined to do so. (*Loy*, *supra*, 52 Cal.4th at pp. 60-61; *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 827.) The decisions of the California Supreme Court " 'are binding upon and must be followed by all the state courts of California.' " (*People v. Perez* (2020) 9 Cal.5th 1, 13.) Thus, given the established precedent from the California Supreme Court, we cannot reverse based upon defendant's claim that Evidence Code section 1108 is unconstitutional because it permits the admission of propensity evidence.

D. *The Trial Court's Finding That Section 654 Did Not Barr Consecutive Sentences Is Supported by Substantial Evidence*

Finally, defendant contends the trial court erred in sentencing him to consecutive terms of imprisonment on counts 3 and 6 for the violations of section 288, subdivision (a). As relevant here, counts 1 through 3 involved conduct directed at K.S., whereas counts 4 and 6 involved conduct directed at K.F. Defendant argues that the sentences on counts 3 and 6 should have been stayed pursuant to section 654 because "it cannot be determined that the jury returned a verdict for a different and distinct crime from those of the jury verdicts in counts one and two, and count four, precluding a separate term on each crime." We disagree.

Generally, section 654 prohibits multiple punishments for a single act or an indivisible course of conduct. (*People v. Leonard* (2014) 228 Cal.App.4th 465, 498.) " ' "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor." ' . . . [¶] 'If [a defendant] entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*Id.* at pp. 498-499.) "We review the trial court's implied determination that section 654 does not apply for substantial evidence." (*Id.* at p. 499.)

Initially, we reject defendant's contention that the lack of an explicit finding by the jury linking specific conduct to each conviction prevents the trial court from exercising

23

its sentencing discretion pursuant to section 654. " 'Ordinarily, in determining whether Penal Code section 654 applies, the trial court is entitled to make any necessary factual findings not already made by the jury.' " (*People v. Deegan* (2016) 247 Cal.App.4th 532, 545.) " '[I]n the absence of some circumstance "foreclosing" its sentencing discretion . . . , a trial court may base its decision under section 654 on *any* of the facts that are in evidence at trial, without regard to the verdicts.' [Citation] Indeed, the trial court 'may even rely on facts underlying verdicts of *acquittal* in making sentencing choices.' " (*People v. Carter* (2019) 34 Cal.App.5th 831, 842.)

With respect to the alleged lack of a jury finding in this case, *People v. Carter*, *supra*, 34 Cal.App.5th 831, is instructive. In that case, a jury convicted the defendant of murder as well as a separate underlying felony; and the trial court imposed consecutive sentences for both convictions, despite the fact that felony murder was one theory argued by the prosecutor in pursuing the murder conviction. (*Id.* at pp. 838-839.) In upholding the trial court's sentencing discretion, the Court of Appeal explained that "if the prosecution presents alternative theories—such as premeditation and felony-murder—and there is evidence supporting a finding that the murder was premeditated, then the trial court may properly impose a sentence for both the murder and the felony. . . . [¶] [T]he trial court did not need . . . an affirmative finding by the jury to exercise its sentencing discretion under section 654." (*Id.* at p. 842.) Thus, the mere absence of affirmative findings by the jury explicitly setting forth which acts form the basis of each conviction is not sufficient to preclude the imposition of consecutive sentences under section 654.

We proceed to consider whether substantial evidence in the record supports the trial court's conclusion that section 654 did not preclude separate punishment on count 3 and count 6. Here, K.S. generally testified that defendant forced her to engage in sexual intercourse in their home on multiple occasions and as frequently as once a week. Additionally, K.S. described separate incidents in which defendant forced her to orally copulate him in the garage and at least two, specific incidents in which defendant forced her to engage in sexual intercourse in a vehicle outside the home. In light of K.S.'s testimony describing more than three separate, distinct sexual acts occurring in more than three distinct physical locations, there was substantial evidence in the record upon which the trial court could rely to conclude that section 654 did not apply to preclude separate punishment on count 3.

Likewise, K.F. testified that defendant rubbed her private area at least one time in their home in Apple Valley and multiple times in their home in Adelanto. With respect to the touching in the Adelanto home, K.F. specifically recalled that it occurred in a bedroom on the second floor of the home as well as a bedroom on the first floor. K.F. also specifically described an incident in the playroom of their home in which defendant forced her to orally copulate him. Given the distinct, physical locations in which each of these acts occurred, there was substantial evidence in the record upon which the trial court could rely to conclude that section 654 did not apply to preclude separate punishment on count 6.

The fact that the jury's verdict did not include explicit factual findings correlating each conviction with distinct factual circumstances is not sufficient to preclude the

25

imposition of separate punishment under section 654.  Where substantial evidence in the record supports a finding that distinct acts could have formed the basis of each conviction, the trial court was within its discretion to make that finding in order to sentence defendant, and we find no error in the trial court's decision to impose a separate punishment for each conviction in this case.

## IV.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS_____
Acting P. J.

We concur:

RAPHAEL_____
J.

MENETREZ_____
J.